First case for argument, Ledbetter v. Good Samaritan. Mr. Ledbetter. Yes. My name is Lindsey J. Ledbetter. I'm the plaintiff's appellate in this matter. I would like to thank the appellate court for giving me this opportunity to give an oral argument. My oral argument starts with the district court did not allow me to, I'm in a Title VII situation and the district court, you know, granted summary judgment in favor of the defendants. And I had this all down, but now it's kind of different being before you. We've all been there. Well, it's my first time. The plaintiff in this matter would like to ask for relief of the summary judgment judgment that was entered in favor of the defendant and overturned that because of the district court judge. The district court in this matter did not give me a summary judgment hearing, which violated my fourth, fifth, sixth, and seventh amendment constitutions on due process, procedural due process, and also confidential clause and right to a jury trial. The defendant, the plaintiff in this matter meets all standards of Southwestern Bell, you know, in retaliation, Southwestern, Texas Medical Center versus Nassar, in that one, I was in a protective category, the filing of an EEOC charge. Two, there was an adverse employment action taken against the plaintiff was terminated. And three, temporal proximity of the termination, which was less than 24 hours after the defendants received the EEOC charge. Also, too, with number three, the pretextual answers for my termination over the course of this case that the defendants and their attorneys have given. One of those answers that they gave was to the unemployment security that I was perceived as intimidated by my clients and that the employers were, they were, I have so much going on in my mind, and that the employers were, you know, uh, they didn't, uh, when it came down to, you know, where they could appeal the decision, when it was in my case, there was no incident occurring. There was no misconduct on my part dealing with the termination. Uh, they didn't appeal it. So therefore I couldn't get any more documentation from that. What was the, what was the date on which you were fired? I was fired on October 20th, 2010. They received notice from the EEOC on October 19th, 2010. So October 20th. Now had you, um, so were you paid up to October 20th? Yes. I worked the night. I worked the 12 to 8 shift, midnight shift. And at seven o'clock in the morning, Bobby Anderson, my direct immediate supervisor, brought me into a meeting and he asked me if I filed a EEOC charge. I said, yes. He said, did you file a second EEOC charge? I said, yes. And then he was asking me something else about filing with the EEOC. And then he said at seven o'clock, he said, you're no longer employed here. You're terminated from your job at Good Samaritan. So I asked him, so as I was getting ready to leave, I asked Bobby, I said, well, did I do anything wrong? He said, no. I said, well, there was a 10-5 disciplinary letter that said that I had to do something wrong in order for you to terminate me. And he said, we're not going to even get into this. So, and then after that, you know, so as I was leaving, you know what I mean? Bobby said, you know, why couldn't you just let, you know, this, girl, you know, leave early? And that went back to a 2009 situation where this young lady was just leaving, going off the job. And then one day after the six or seven time, I asked her, you know, because I was coming to work early. I asked her, I said, excuse me, are you leaving? She said, yeah. But I said, but aren't you supposed to be here until 12 o'clock? Because my shift doesn't start until 12 o'clock. And she goes, well, you're here. I said, well, my understanding is you just can't walk off the job like that. So what she did is she ran upstairs and she went to Bobby. Then and then, uh, he was, he, he was cursing me out and it took every bit for me, not to say anything. He asked me if I was going to be a jerk, excuse my language, you know what I mean? And not, and not let her go home early, the good Samaritan shelter. Yes. Yes. And I said, you know, I said, it's not my responsibility to tell her. She wouldn't even ask me if she would just get up and walk out the door. So I didn't even know sometimes, you know, cause I would come in early by 1130, you know, me to start, you know, cleaning up, you know, doing my pre-prep and everything that I have to do for the, you know, the center for the morning. And I come out, she would be gone, you know, and then Bobby asked me a second time, you know, are you going to be a fucking jerk and make her stay? I said, well, look, you know, it's not up to me to make a decision what to say. I said, she didn't even ask me if, if she could leave. I would have let her leave early cause I was already there. It sounds like this was a fight about, um, shift changing procedures. Well, this was 2009. And this is one of the questions that he asked me on the date of my termination. The last thing he asked me before we were leaving. Right. But this is a retaliation claim. Well, no, the retaliation claim goes to my termination on the 20th. It goes down to the EOC charge that I filed on October 4th, 2010. When that, that goes into the 928 situation where the kitchen coordinator accused me of getting into a confrontational kind of situation with her. And that never happened. She accused me of not telling her where the residence list. Now for the whole year that this, uh, new kitchen coordinator worked there, the, we have a desk and everything is already on the desk. So therefore there's no reason for her to ask me because for the whole year, she would come get her thing, you know, and go and do it. So that never happened. Then she, uh, she accused me of wanting to, uh, that I was mad because I couldn't go into the office anymore. For the most time of, uh, that year, we had access to the food kitchen coordinator's office and that's what we would make the residence list on the computer. Mr. Ledbetter, let me, if I could interrupt for a second. We're, we're, the way this case comes to us, we're frankly not going to get involved in the details about that 2009 encounter. And the focus really is on the district court's reason for granting summary judgment here, which, which in essence, you say you were, well, we all know you were fired on the 20th. Yes. We know that, uh, the Good Samaritan got word on the 19th about your second EEOC charge, but we also have these affidavits from, uh, from, uh, the, the Good Samaritan managers saying, no, we decided about a week earlier that we were going to fire Mr. Ledbetter. And if that's true, then you lose. That's not true though. Okay. So what's the evidence that it's not true? I gave evidence to the district court that Ms. Rose, the attorney for the defendants litigated up at the EEOC that on October 17th, I filed with the unemployment security for unemployment benefits for getting terminated on the 20th. She went into a scenario that I was being combative, argumentative, and I was trying to get myself fired. And somehow I managed to get myself fired on the 20th. And then she said, you know, me and paperwork to the EEOC that Bobby Anderson brought me into a meeting on the 20th. And during that, during that meeting, you know, Bobby Anderson decided then, you know, that I, you know what I mean, was, you know, not going to change. And I wasn't good for the Good Samaritan. I was being combative and argumentative and none of that, none of those things happened. And so it was a whole different story that they gave to EEOC. Now, my understanding is what, what, and I might be wrong about that because I'm not an attorney, that what she litigated to the EEOC should have been the same thing that she litigated in the summary judgment motion. Now, if you go from page 70 to page 87 of the appendix that deals with me giving interrogatories, asking them, what day did I get fired? What day did you come to this conclusion? So I went through all those answers, a whole bunch of different answers, you know, to Mike Heath, Bobby Anderson. Mike Heath was representing the Good Samaritan Ministries. I went through all those things. And the only thing they say is we, can't remember when we came to the conclusion, but only that you were fired, you know what I mean, before, you know, the 19th, we received notice, you know, of EEOC charge. So, and then all of a sudden, when I get the summary judgment motion, they say, you were, we came to this conclusion on the 14th. Now, that, that doesn't sit right with me because it didn't give me the opportunity to address that in discovery, as far as how they came to that conclusion, because they would never give me an answer. They would say that I was intimidating, that I was abrasive. I would say, okay, what did I do that was intimidating and abrasive? And they, and they said, well, you know, nothing was recorded and this, and they went through this all through the discovery process where they could not tell me that I ever did anything wrong. Also, too, they gave me documentation that, in discovery, that they were supposed to, after the October 5th letter, if there was any incident that involved me, it was going to be thoroughly investigated. They were going to have other, you know, it was going to be a neutral party who was going to make the decision, and then they were going to go through that, but they never did that, you know, and that was one of the questions I asked Bobby, what did I do on, you know, October 20th, what did I do? So, they went through a whole bunch of different scenarios. Also, too, they didn't address how I was going to be terminated in their answer to my complaint. They kept, you know, turning around and giving different... We're running out of your time, so why don't you save the rest of your time. Yes, thank you, sir. Thank you. Mr. Rode. My name is Sherry Rode, and I represent Good Samaritan Ministries, and I think the court has hit right on the issue in this case. There's no, as Judge Herndon said at the trial court, after the presentation of the briefs in summary judgment, there is uncontroverted evidence that the decision to terminate Mr. Ledbetter was made on October 14th, 2010. Why was the actual discharge deferred to the 20th? Mr. Bobby Anderson, his direct supervisor, has a job. He is a nurse. He's on 12-hour shifts. That was the first day both of them were at Good Samaritan at the same time that he could communicate the decision. Wait, I'm sorry. I don't understand. I don't understand. Sir? I don't understand what you're saying. So, October 14th, they decide to fire him. Correct. Now, why do they defer that by six days? Because Mr. Anderson, who is Mr. Ledbetter's immediate supervisor, works 12-hour shifts as a nurse. At another job? At another job. Yes, sir. I'm sorry. What does this have to do with anything? If they want to fire him, why don't they tell him you're fired? Why do they wait six days? Because Mr. Anderson... Well, who cares about Mr. Anderson? Okay. I can't tell you other than... Well, who's the boss of the company? Mr. Anderson was his direct supervisor. Yes, I know, but he's not the boss of the company. So, why do they have to wait six days for Anderson to show up? That was Mr. Heath's decision with Mr. Anderson. But what was the basis for that decision? That Bobby Anderson wanted to be the one to communicate to him. What, he wants to deliver the message? He did. Why? Your Honor, I can't... Doesn't make any sense. No one wants to be the messenger of bad news. I can only... Also, what about the timing? So, the 19th, they find out that he's filed another complaint, and whammo, they fire him the next day. Well, an important part of that... Isn't that suspicious timing? It is not, because as Mr. Ledbetter indicated, he filed an unemployment charge on the 17th, saying he'd already been terminated. And he also admits in his brief that... Wait a minute, what? I'm sorry? Well, I don't understand that at all. He filed a claim for unemployment. He made that claim on the 17th. Do we have that in our evidence? He did. He just argued it to you. I heard that. It's in his brief as well. Is there evidence of it? His admission in his brief... Oh, there was, Your Honor. I didn't present the evidence. It was presented to the EEOC in the chronology of events that he already understood, or he believed himself to have been terminated. I didn't know that. I don't understand. Had Anderson sneaked the news to him? That's a question for Mr. Ledbetter, with all due respect, Your Honor. That's what he said. Well, you're the party who's telling us that there's no material dispute of fact, right? As to the timing. Let me, if I could, ask you, Ms. Rode, about the affidavits of Mr. Heath and Mr. Anderson. Yes, sir. I've never seen affidavits like this for summary judgment that don't actually spell out the facts, that instead say, I've read the defendant's motion for summary judgment in the memorandum. Rather than reiterate every fact, I affirmatively state that each and every fact attributed to me in defendant's motion and memorandum is true and correct, to the best of my knowledge. Yes, sir. How do you impeach somebody who's signed an affidavit like that? This case, well, I guess the facts that are laid out in the brief, Your Honor, it was done... Well, let's take a look at that, okay? Yes, sir. For example, I'm looking at page two of your account of what happened on the night of June 17th, 2010. Does any of that come from Heath or Anderson? I'm sorry, what page, Your Honor? Essay 17 from your appendix. I'm sorry, I don't have my appendix up here with me. But the information came from, if it's cited to Mr. Ledbetter, then both of the gentlemen testified that these were the facts. It is unusual. But they couldn't have personal knowledge of that incident, which was between plaintiff and a resident and Nevers, right? Oh, you're asking in terms... I'm sorry, Your Honor. You're asking in terms of what occurred between Mr. Ledbetter and the... I'm asking about the facts set forth in your brief in support of summary judgment. I'm asking, what is the evidentiary foundation for that? The discussion that Mr. Anderson and or Mr. Heath had with the resident in question. So it is complete hearsay? It is. But it is in terms of... It is presented as fact here, correct? It is a fact that they had the discussion with the resident. This was the basis... And you presented it as an undisputed fact? I presented it as the facts as they relied upon them, yes, Your Honor. And then a little lower on the page, on September 28, 2010, there was an incident between plaintiff and a supervisor. When that supervisor arrived for her shift, plaintiff refused to answer her questions regarding a resident list and whether the computer was Yes, Your Honor. It is the basis of their decision. That is correct. But as to whether the conversation... So if I want to cross-examine them about whether any of that is true, they'd simply have to say, well, I don't know, right? They would say that that's what they relied upon, but whether it actually occurred, that's correct. But whether their decision was incorrect or not... Well, I'm fully aware of our law on this subject, but I'm also aware of what you need to do to move for summary judgment, which is present evidence. And I don't see how this is it. Plaintiff... A little further down in your brief, plaintiff was given a letter memorializing defendant's concerns and repercussions that would occur if he continued to engage in the improper behavior discussed during the October 5, 2010 meeting. Plaintiff was asked to sign the letter only to acknowledge that he had read and received a copy. While plaintiff signed the letter, he did so claiming that his signature was made under duress. Now, both of the two key sentences there are written in the passive voice. They're not attributed to either Heath or Anderson. They were both present and both personally... And how do you pin them down on that given the way these affidavits are set up? They can each deny that to their heart's content if they want to. They're not denying it, your honor. I'm sorry. They said... I'm picturing a trial, right? Since we sometimes have those after summary judgment motions. And they testify and they aren't pinned down at all by anything in this affidavit. That they presented a letter... That's not what it says. Plaintiff was given a letter. That doesn't attribute anything to Heath or Anderson. I hear you, your honor. Is this a customary practice for doing affidavits? It is not, your honor. This is a case that has been twice before the district court in two different matters. There is a lot of documentation evidence. It was an unusual basis for an affidavit. I had and it is the same that was... So what was the reason for it? I'm sorry? What was the reason? Just not to lay it to more documentation before the court in a more expansive set of papers. No other reason. Now do you argue anywhere that his complaints to the EEOC or the lawsuit he filed were frivolous? Was frivolous? I believe it was unwarranted but he had the right to file it, your honor. Can I ask about something that is troubling me? Assuming we can decipher who's testifying as to what here, it does seem that Heath and Anderson... No, wait a minute. Heath and Kent. Sorry, we don't have Kent. Heath and Kent have this meeting on October 5th basically saying, shape up. Don't mess up again or we'll fire you. Correct. And gave him a letter to that effect, right? Yes, sir. But the decision to fire him was then made with no further, I guess, incident or evidence against him. Is that right? There were, there was the incident of him calling the director Heath liar, that sort of thing. When was that? I'm sorry? When was that? It was after the letter of the fifth, just shortly thereafter. And then Mr. Heath didn't have an opportunity to talk to Mr. Anderson about what they wanted to do. But if I may, your honor, the key here is whether there is any temporal evidence and by the plaintiff's own admissions, the good Samaritan didn't get a notice of his charge until the 19th. Is there any corroboration, any, I mean, a note, anything else that the decision was actually made on the 14th? No, sir. Okay. Well, thank you, Mr. Rode. Mr. Ledbetter, you have another minute or so. Your honor, in my opinion, it's on page 49. It talks about this evaluation situation. He's a and she totally denies everything that Mike Heath said happened in this situation because she was upset about the fact, you know what I mean? That she was supposedly said all these things, you know what I mean? I got her to write a statement out for me. I even marked it, you know what I mean? On a date and therefore that didn't happen. The thing that goes with the, when, when the judge was asking her about the district court made me rewrite my, my affidavits. They didn't make them rewrite their affidavits. The situation and stuff like that with Savalia Smith, you know what I mean? Happened in June of 2018, you know, June 2017. And they brought that back into the situation. When you were asking her about, you know, Bobby Anderson and them, you know, about my termination also to Bobby Anderson said, you know, that I was terminated on July on, when I was terminated, he wrote a letter on October 26th, which is in the appendix. Why did you file for unemployment compensation three days before you were terminated? I didn't. I filed for unemployment compensation on the 21st of October. Ms. Rhodes knows that. Did you get the date wrong in some of your documents? I didn't have the date wrong. She's the one who said that I filed for the 17th. I was fighting with unemployment security about the 17th because they kept saying that I filed for unemployment on the 17th. And I said, why would I file for unemployment on the 17th when I got filed on the 20th? How would I know that I was going to be filed on the 20th? Where does the 17th date come from? Ms. Rhodes and stuff like that, you know, I think. Does it appear on any of the documentation? It's not on, I think it's on a doc, it's not on a documentation that I filed on the 17th, but I think because the EEOC had to call unemployment security to find out how they did their letterhead. And I shouldn't be giving her a built-in defense on this, you know, but the question was, you know, they said they'd go the week ahead. So if I filed on the 21st, they would actually go to that Sunday, which was the 17th. And you mean they'd backdate your claim? Well, I went through that argument with unemployment security. You know, we went round and round on that because I said, I need documentation stating that, you know, that I filed on the 21st, which they gave me. I even wrote a letter to the district court about the situation. You know what I mean? That she was trying to say that I filed on the 17th, if I remember correctly. And I have the documentation that I can present to the court at any time that says I filed for unemployment on the 21st. I never filed. The 17th issue, she went into a whole charade about how I was orchestrating, you know, my termination. I didn't know I was getting terminated on the 20th, but, you know, I'd grown up in the meeting. I knew something was wrong, you know, and then when Bobby started telling me about, did I file on, you know, the EEOC the first time? I said, yes. Did I file with the EEOC the second time? Then I knew they got the second notice of the, you know, the EEOC. And he terminated me immediately after that. But I know, when she's up here saying that I filed with unemployment compensation, I wouldn't even think about filing with unemployment compensation. Well, thank you, Mr. Lebrun. Your time has expired. We thank you, and we thank Mr. Rode.